# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**THOMAS WILSON, JOHN
GALVAGNO, and ERICA CRUZ
individually and on behalf of
all others similarly situated,**

                    *Plaintiffs,*

**vs.**

**THE CORDISH COMPANIES, INC.**
601 E. Pratt Street, 6th Floor
Baltimore, MD 21202

**ENTERTAINMENT CONSULTING
INTERNATIONAL, LLC**
601 E. Pratt Street, 6th Floor
Baltimore, MD 21202

**PL PHASE ONE OPERATIONS L.P.
D/B/A XFINITY LIVE! PHILADELPHIA
AND 1100 SOCIAL**
601 E. Pratt Street, 6th Floor
Baltimore, MD 21202

**PL PHASE ONE OPERATIONS G.P.,
INC. D/B/A XFINITY LIVE!
PHILADELPHIA
AND 1100 SOCIAL**
601 E. Pratt Street, 6th Floor
Baltimore, MD 21202

                    *Defendants.*

Case No.:   **1:18-cv-03285-JKB**


**JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Thomas Wilson, John Galvagno, and Erica Cruz, individually and on behalf of

all others similarly situated, bring this action against Defendants The Cordish Companies, Inc.

(hereinafter "Cordish"), Entertainment Consulting International, LLC (hereinafter "ECI"), PL

Phase One Operations L.P. and PL Phase One Operations, G.P., Inc. d/b/a XFINITY Live!

Philadelphia and 1100 Social (collectively hereinafter "XFINITY Live!", and all together, "Defendants"). Plaintiffs seek redress for Defendants' practice of sending text messages to cellular telephone numbers in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq*. Plaintiffs, for their Class Action Complaint, allege the following based upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief:

<u>**PARTIES**</u>

1.      At all times relevant hereto, Plaintiffs Thomas Wilson, John Galvagno, and Erica Cruz have been residents of Philadelphia County, Pennsylvania.

2.      Defendant The Cordish Companies, Inc., is a Maryland corporation with its principal place of business at 601 E. Pratt Street, Baltimore, MD 21202.

3.      Defendant Entertainment Consulting International, LLC is a Maryland limited liability company with its principal place of business at 601 E. Pratt Street, Baltimore, MD 21202.

4.      Defendant PL Phase One Operations, L.P. is a Pennsylvania limited partnership with its principal place of business at 601 E. Pratt Street, 6th Floor, Baltimore, MD 21202.

5.      Defendant PL Phase One Operations, G.P., Inc. is a Pennsylvania general partnership with its principal place of business at 601 E. Pratt Street, Baltimore, MD 21202.

6.      The PL Phase One entities are general partners (*see* Doc. 7) that own and operate XFINITY Live! Philadelphia and 1100 Social. XFINITY Live! and 1100 Social are fictitious entities with their principal place of business at 1100 Pattison Avenue, Philadelphia, Pennsylvania 19148.

7.      Cordish and ECI effectuates and oversees all, or substantially all, of the advertising and/or marketing decisions taken its venues, including XFINITY Live! and 1100 Social. As

described below, these venues are not independent ventures, but rather a direct extension of the Cordish brand itself, and have their day-to-day operations dictated by and through ECI, itself a division of Cordish.

8.      The marketing decisions controlled by Cordish and ECI include, but are not limited to, (i) the collection of names and cellular telephone numbers of customers or prospective customers, (ii) the development of an Automated Telephone Dialing System ("ATDS") for sending text messages, and (iii) the use ATDS to send advertising and/or telemarketing text messages *en masse* to such cellular telephone numbers.

## JURISDICTION AND VENUE

9.      This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.     This Court has personal jurisdiction over all Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because Defendants' principal place of business is located in Baltimore, Maryland, because Defendants' advertising and/or marketing operations are based in Baltimore, Maryland, and/or because substantial and relevant events and/or omissions related to Defendants' violations of the TCPA took place in Baltimore, Maryland.

11.     Defendants are separately created entities, however, each one operates out of the same location at 601 East Pratt Street, Baltimore, Maryland, and each is controlled by the same agents, officers, and/or directors.

12.     Defendants' affiliations with the state of Maryland are so "continuous and systematic" as to render them at home in this District, because Defendants' regular and systematic corporate decision-making is made within the Maryland offices at 601 East Pratt Street.

13.     Defendant PL Phase One Operations G.P., Inc. identifies itself on the Pennsylvania

Business Entities database as the owner of XFINITY Live! and also identifies its base of operations and mailing address as 601 East Pratt Street, Baltimore, Maryland.

14.     Defendant PL Phase One Operations L.P. makes regular corporate decision-making out of the Baltimore, Maryland address, including but not limited to, Universal Licensing System applications to the Federal Communications Commission that identify 601 East Pratt Street, Baltimore, Maryland as the primary address.

15.     Defendants' website "terms and conditions", dated May 21, 2018, and July 25, 2018, specifically identify 601 East Pratt Street in Baltimore, Maryland as the contact location for all Defendants.[1]   Although by definition the Classes are not subject to the terms of Defendants' May 21, 2018 or July 25, 2018 website terms of use, such terms specifically require that any dispute against ECI or any of its clients (defined as including Xfinity Live!, PL Phase One, LP, and PL Phase One Operations LP) **"must be brought"** in Baltimore County, Maryland courts, to wit:

> ANY DISPUTE MUST BE BROUGHT IN THE STATE OR FEDERAL COURTS LOCATED IN OR HAVING JURISDICTION OVER BALTIMORE COUNTY, MARYLAND AND YOU HEREBY CONSENT AND WAIVE ALL OBJECTIONS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS.[2]

### NATURE OF THE ACTION

16.     XFINITY Live! is an entertainment establishment located in downtown Philadelphia.  1100 Social is a drinking establishment located within XFINITY Live!

17.     Both XFINITY Live! and 1100 Social are fictitious names utilized by Cordish and ECI, which have exclusive and complete control over the actual operation of these venues.  This

---

[1]      https://www.xfinitylive.com/terms

[2]      *Id*.  Plaintiffs dispute that Defendants' website terms of use apply to their claims, and merely cite to such terms as support for Plaintiffs' jurisdictional allegations.

control extends directly to the marketing and promotion of the bars.

18.     Between July 30, 2014 and April 4, 2018, Defendants caused text messages to be sent to the cellular telephones of Plaintiffs and the putative Class members in violation of the TCPA. Defendants sent these messages for the purposes of advertising and marketing the products and services of XFINITY Live! and 1100 Social, to increase their revenue and expand their customer base.

19.     Specifically, Defendants (either directly or through a third-party telemarketer) sent unsolicited text messages to the cellular telephones of Plaintiffs and the putative Class members promoting specials and events at XFINITY Live! and/or 1100 Social and encouraging Plaintiffs and the putative Class members to visit XFINITY Live! and/or 1100 Social with their friends.

20.     By sending the text messages alleged in this Complaint, Defendants have caused Plaintiffs and the putative Class members (as defined herein) actual harm.

21.     On information and belief, Defendants routinely sent, and continue to send, the text messages despite the fact that Plaintiffs and the putative Class members:

        (a)     never provided prior express consent in writing, or otherwise, for Defendants to send advertising or telemarketing text messages to their cellular telephone numbers; and/or

        (b)     never provided prior express consent in writing, or otherwise, for Defendants to send text messages to their cellular telephone numbers using an automatic telephone dialing system (as defined by the TCPA).

22.     Defendants also sent the advertising text messages to Plaintiffs and other putative Class members even though (i) they failed to establish written policies and procedures to ensure compliance with the national and/or internal do-not-call rules and regulations, and train their staff

in compliance with such policies and procedures, and/or (ii) Plaintiffs and other putative Class members have registered their telephone numbers on the national do-not-call registry.

23.     Plaintiffs, on their own behalf and on behalf of all others similarly situated, bring this lawsuit for an injunction requiring Defendants to cease all unsolicited text message activities and for an award of statutory damages to Plaintiffs and members of the putative class under the TCPA.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991
### 47 U.S.C. § 227, *et seq.*

24.     Advancements in telephone dialing technology since the 1980s and 1990s have made reaching a large number of consumers by telephone easier and more cost-effective.  This technology, however, has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money.

25.     Senator Ernest Hollings, sponsor of the TCPA, described such marketing practices as "the scourge of modern civilization, they wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall."  137 Cong. Rec. 30, 821 (1990).

26.     The FCC recently noted, "every month, U.S. consumers are bombarded by an estimated 2.4 billion robocalls."  *In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls*, Notice of Proposed Rulemaking, Statement of Chairman Pai, 32 FCC Rcd. 2306, 2331 (2017) (emphasis added).  That number has since increased to an estimated 2.5 billion robocalls per month as of October 2017.[3]

---

[3]     *See In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls*, Report and Order and Further Notice of Proposed Rulemaking, Statements of Commissioners Clyburn and Rosenworcel, 32 FCC Rcd. 9706, 9756 & 9759 (2017).

27.    In response to these unwanted telephone calls, text messages, and junk faxes, the federal government and numerous states have enacted legislation to combat these widespread telemarketing abuses.  As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers. … *Banning such automated or prerecorded telephone calls* to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, *is the only effective means of protecting telephone consumers from this nuisance and privacy invasion*.

Pub. L. No. 102-243 §§ 2(6) & (12) (1991), *codified at* 47 U.S.C. § 227 (emphasis added).[4]

28.    As is relevant here, the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service, …"  47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(1).

29.    For purposes of the TCPA, "[a] text message to a cellular telephone … qualif[ies] as a 'call' within the compass of § 227(b)(1)(A)(iii)."  *Campbell-Ewald Co*. *v*. *Gomez*, 136 S. Ct. 663, 667 (2016) (citation omitted).[5]

30.    "Automatic telephone dialing system" ("ATDS") refers to any equipment that has the "capacity to dial numbers without human intervention[.]"  *Griffith v*. *Consumer Portfolio Serv*.,

---

[4]    *See also Susinno v*. *Work Out World*, 862 F.3d 346, 352 (3ʳᵈ Cir. 2017) ("'[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients'. . .") (*quoting Van Patten v*. *Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)).

[5]    *See also In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Order, 30 FCC Rcd. 12484, 12485, ¶ 3 (2016) (the TCPA's prohibition on robocalls "encompasses both voice and text calls, including short message service (SMS) calls and text calls and text calls made using Internet-to-phone technology . . .").

*Inc.*, 838 F. Supp. 2d 723, 726 (N.D. Ill. 2011) (*citing In re Rules & Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14014, 14092, ¶ 132 (2003) ("2003 TCPA Order")).

31.     In 2012, the FCC – the agency tasked with promulgating the implementing regulations of the TCPA – revised its TCPA rules to require *prior express written consent* before initiating a telephone call "that includes or introduces an advertisement or constitutes telemarketing[.]" 47 C.F.R. § 64.1200(a)(2); *In re Joint Petition filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6589, ¶ 37 & fn. 113 (2013) ("Dish Network Ruling").

32.     According to FCC regulations, "*prior express consent*" must (i) be in writing; (ii) be signed by the person providing the consent; (iii) clearly authorize the calling party to use an ATDS or artificial or pre-recorded voice; (iv) specify the telephone number to which the person is consenting to be called; and (v) not be a condition of purchasing any goods or services. *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, FCC Report and Order, 27 FCC Rcd. 1830, 1843, ¶ 32 (2012) ("2012 TCPA Order").

33.     In 2003, the FCC adopted a national do-not-call registry to provide consumers with an option to prohibit unwanted telemarketing solicitations. *2003 TCPA Order* at 14034-35, ¶ 28.

34.     The FCC rules also prohibit any person or entity from initiating a telemarketing solicitation to any "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). For purposes of this provision of the TCPA, wireless subscribers who are registered on the national do-not-call list are presumed to be "residential subscribers." *2003 TCPA Order* at 14038-39, ¶ 36.

35.     The FCC rules also require telemarketers to maintain a company-specific internal do-not-call list, to immediately record a consumer's do-not-call request, and to cease any further

telemarketing calls within thirty days of such request.  47 C.F.R. § 64.1200(d)(3).

36.     The FCC's regulations define "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services."  47 C.F.R. § 64.1200(f)(1). Whether a call is an "advertisement" depends on the content of the material.  *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

37.     "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. § 64.1200(f)(12).  The "telemarketing" inquiry focuses on the purpose of the telephone call or message, rather than its content.  *Golan*, 788 F.3d at 820.

38.     The FCC has also made rulings regarding the TCPA's vicarious liability standards as they relate to telemarketing.  As early as 1995, the FCC stated that "[c]alls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call."  *In re Rules and Regulations Implementing the TCPA of 1991*, 10 FCC Rcd. 12391, 12397 (1995).

39.     The FCC has also clarified that vicarious liability is imposed under federal common law principles of agency for violations of either sections 227(b) or (c) that are committed by third-party telemarketers.  *Dish Network Ruling* at 6580 & ¶ 18.

40.     The TCPA provides for injunctive relief and the greater of actual damages or $500 per violation, which may be trebled where defendant's conduct was done willfully or knowingly. 47 U.S.C. §§ 227(b)(3) and (c)(5).

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

41.     Cordish is a family owned and privately-held commercial real estate developer. Cordish builds co-working spaces, entertainment districts, gaming, hotels, restaurants, and sports-

anchored developments. Cordish owns over 50 restaurants, bars, and live music venues around the country. According to its website, "[t]he Cordish Companies still *owns and manages* virtually every business it has created."[6] (Emphasis added).

42.     In a "Request for Qualification" filed by Cordish with the Virginia Beach Development Authority on April 6, 2017, Cordish provided a list of "Developments Owned and Managed".  Among the developments listed is "XFINITY Live! Phase One, Philadelphia, PA – Sports Anchored Mixed-Use/Live Entertainment".[7]

43.     To retain exclusive and complete control over its bar and restaurant developments, Cordish established an internal Entertainment Management Division in 1994, which it assigned the name Entertainment Consulting International ("ECI"). While ECI publicly holds itself out as providing services to a variety of clients in the hospitality business, on information and belief, it exclusively provides services to Cordish-owned establishments.

---

[6]     *The Cordish Companies – About,* http://cordish.com/about (last visited Dec. 11, 2018).

[7]     *Virginia Beach Multi-Venue Entertainment Development, Solicitation RFQ No. 1-2017*, pages 75-77, https://www.yesvirginiabeach.com/resources/special-projects/Documents/RFP/Dome%20Site%202017/Cordish.pdf (last visited Dec. 12, 2018).



**1994**

The Entertainment Management division, Entertainment Consulting International, LLC (ECI) is established.

(Figure 1, showing a portion of a timeline from "About Cordish Companies").[9]

44.     As such, ECI is not the independent company, but rather part and parcel of Cordish itself.  Cordish uses its Entertainment Management Division (*i.e*., ECI), along with numerous holding corporations such as PL Phase One Operations G.P., Inc. and PL Phase One Operations L.P., to develop, implement, manage, and operate multiple entertainment districts (and dozens of bars and restaurants within those districts) across the country, including XFINITY Live! and 1100 Social.

45.     For instance, the LinkedIn profile of Jake Miller, Senior Vice President of ECI, states that he is "Currently managing over 40 bars and restaurants [including] in … Philadelphia, …"[10] The LinkedIn profile of Ashley (Miller) St. Pierre, Director of Marketing of ECI, states that

---

[9]     *The Cordish Companies – About,* http://cordish.com/about (last visited Dec. 11, 2018).

[10]     https://www.linkedin.com/in/jake-miller-284bb238/ (last visited Dec. 12, 2018).

"ECI operates premier dining and entertainment districts including XFINITY Live! (Philadelphia, PA), …"[11] Likewise, the LinkedIn profile of Dayna Wilde, former Sales Building Director of ECI, who worked for ECI from Dec 2011 through May 2013, provides that Ms. Wilde's job duties as Sales Building Director of ECI were as follows:

> … develop and implement sales building programs for multiple entertainment concepts. Train and manage a team of 35 sales managers and coordinators to increase sales in over 30 bar/restaurant/nightclub concepts across 6 entertainment districts. …[12]

46.     Among the suite of services that ECI coordinates and directs for all Cordish bars and restaurants, including XFINITY Live! and 1100 Social, is the ability to mass text message potential customers. Indeed, Cordish, through ECI, is able to provide these mobile marketing services by owning and operating the "TXT Live! SMS Platform," which, as shown in <u>Figure 2</u>, is self-proclaimed by Cordish as being one of its "assets".

---

[11]     https://www.linkedin.com/in/ashleymiller3/ (last visited Dec. 12, 2018).

[12]     https://www.linkedin.com/in/dayna-wilde-444a1614/ (last visited Dec. 12, 2018).



(Figure 2, showing The Cordish Companies' assets).[14]

47.    To access the text messaging portal, Defendants' employees visit the "ECI Contact App" by navigating to the URL "https://txt.live" or "https://ecisms.com," which both exist on the same server. Once logged in, Defendants' employees upload CSV files containing consumers' cell phone numbers, and create and sent promotional text message campaigns.

48.    The ECI Contact App website reveals source code with instructions and a FAQ section for Defendants' employees explaining how to use the text messaging platform. For instance, in response to "How do I create a new contact(s)?" the ECI Contact App states that users "can select 'Add New Contact' or 'Import CSV' and follow instructions from there." And, in

---

[14]    *Entertainment Consulting International, LLC – Services / Sales & Marketing*, http://ecimgt.com/services ("Corporate national sales team to support unit level sales associates including: access to database management software … [including] Mobile marketing …") (last visited Dec. 12, 2018).

response to "How do I start a new campaign," the ECI Contact App states, "Near the top right corner of the blue section, you'll see a 'New Campaign' button. Click this, select a group(s) you want to campaign to, adjust filters, click 'Apply Filters' and type the text you want to send."[15]

49.     As such, ECI developed the policies and procedures for creating text messaging campaigns and collecting lists of consumers' names and phone numbers for use in telemarketing campaigns.

50.     Most importantly, Cordish played a part in bringing the ECI Contact App online. Aside from listing TXT Live! as one of its primary assets, Cordish owns the domain names associated with the text messaging platform. In fact, Cordish's Director of Information Services, Paul Weil, registered the "txt.live" domain name by using an official Cordish email address and Cordish's mailing address in Baltimore, Maryland. Paul Weil also registered the "cordish.com" domain name by providing the same Cordish email address and company address.

51.     Between July 30, 2014 to April 4, 2018, Defendants and/or their agents utilized the ECI Connect App (*i.e.*, txt.live) to send text messages to the cellular telephone numbers of Plaintiffs and the putative Class members for the purpose of promoting XFINITY Live! and 1100 Social.

52.     Specifically, the hardware and software used by Defendants and/or their agents had the capacity to generate and store random numbers, or store lists of telephone numbers, and to dial those numbers, *en masse*, in an automated fashion without human intervention.

53.     Plaintiffs and the putative Class never provided prior express consent, in writing or otherwise, for Defendants to send autodialed, advertising, telemarketing text messages, and/or any other communication to their cellular telephone numbers.

---

[15]     *See* https://txt.live/users/sign_in

54.     When Defendants obtain the cellular telephone number of a consumer or business, they add them to a stored list of numbers to which Defendants and/or their agents repeatedly send autodialed, advertising, and/or telemarketing text messages.

55.     Defendants' text messages are sent with equipment having the capacity to dial telephone numbers without human intervention, the equipment is unattended by human beings, and the equipment does, in fact, send text messages automatically, *i.e.*, without human intervention.

56.     The equipment employed by Defendants and/or their agents not only have the capacity to store or produce telephone numbers to be called using a random or sequential number generator (and to dial such numbers), but was programmed to sequentially or randomly access stored telephone numbers to automatically send text messages to those numbers.

57.     The text messages sent by Defendants to Plaintiffs and the putative Class were made for a commercial purpose in that they contain the brand name and location of XFINITY Live! and/or 1100 Social, they promote specials and events at XFINITY Live! and/or 1100 Social, and/or they encourage Plaintiffs and the putative class members to visit XFINITY Live! and/or 1100 Social with their friends or associates.

58.     Defendants' text messages are advertisements and/or constitute telemarketing as defined by the TCPA.  *See* 47 U.S.C. § 227(a); *Golan*, 788 F.3d at 820.

59.     Not only do Defendants fail to obtain prior express consent before sending such text messages, Defendants' text messages do not provide a way of opting out of future text messages.

60.     Defendants sent such telemarketing text messages without first establishing written policies or procedures to ensure compliance with the national and/or internal do-not-call rules and

regulations, as required by 47 C.F.R. § 64.1200(d), and Defendants failed to train their staff in compliance with such policies and procedures.[16]

61.     Defendants sent these unsolicited text messages to Plaintiffs and other putative class members' cellular telephone numbers who may have their telephone numbers registered with the national do-not-call registry.

62.     On information and belief, many of Defendants' text messages were sent within 12 months of one or more prior text messages, and Defendants lack an adequate system for preventing the transmission of numerous automated text messages to the same telephone number.

63.     Defendants are aware that the above-described text messages are being sent to consumers and businesses without their prior express consent, and to consumers and businesses who have registered their phone numbers on the do-not-call registry, but Defendants willfully continue to send them anyway.

64.     Plaintiffs and the putative Class members have been substantially damaged by Defendants' repeated text messages.[17]  Plaintiffs and the putative Class members' privacy was invaded; they were annoyed and inconvenienced; the repeated text messages intruded upon their seclusion and interfered with the exclusive use of their property; they were charged out of pocket cellular airtime minutes for the text messages and cellular data for services related to the text

---

[16]     On September 24, 2018, Plaintiffs requested that Defendants provide their attorneys with a copy of any written policies and procedures that Defendants had established and implemented and/or instituted as of (1) July 30, 2014, (2) February 13, 2018, and (3) April 4, 2018, to ensure compliance with the TCPA, but Defendant failed to produce any such policies and procedures.

[17]     *See Van Patten*, 847 F.3d at 1043 (allegations of "[u]nsolicited phone calls or text messages … invade the privacy and disturb the solitude of their recipients" are sufficient to confer Article III standing); *Susinno*, 862 F.3d 346 (3rd Cir. 2017) (same); *Manuel v. NRA Grp. LLC*, 722 Fed. Appx. 141 (3rd Cir. 2018) (unpublished); *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316 (3rd Cir. 2015).

message content;[18] the ATDS calls intruded upon and occupied the capacity of the cellular phones of Plaintiffs and the Class members, depleted and/or reduced the lifespan of their cellular phone batteries,[19] caused Plaintiffs and the Class members to incur the costs of electricity to recharge their phones;[20] and, on information and belief, Defendants' repeated text messages have caused unwanted use, damage and/or depletion of their property, including, but not limited to, a reduction in the lifespan of their LCD screens, speakers, vibration motors, and other hardware and/or electronic components.

## FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF THOMAS WILSON

65.     At all times relevant hereto, Plaintiff Thomas Wilson has paid a third-party provider for cellular telephone service and cellular data service on his personal cellular telephone, which has an area code specific to eastern Pennsylvania.

66.     Plaintiff Wilson has visited and attended a happy hour at XFINITY Live! and/or 1100 Social.

67.     On multiple occasions in 2015, 2016, and 2017, Defendants and/or their agents

---

[18]     *See In re Rules Implementing the Tel. Consumer Prot. Act of* 1991, 23 FCC Red. 559, 562, ¶ 7 (2008) ("wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used."); *see also Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) (recipients are damaged because they are charged "out of pocket" cellular airtime minutes); *Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 729 (S.D. Tx. 2012) (Plaintiff's statement that he pays a third-party provider for cellular phone services is sufficient to show that an individual was charged for the calls); *Warnick v. Dish Network LLC*, No. 12-cv-01952 (D. Co. Sep. 30, 2014) ("users of cellular telephone numbers *are indeed charged* for incoming calls, regardless of whether they incur any *additional* charges for such calls.").

[19]     *See e.g.*, Apple Inc., *Battery Servicing and Recycling*, http://www.apple.com/batteries/service-and-recycling ("All rechargeable batteries have a limited lifespan … Your own battery's lifespan will vary depending on how you use your device …").

[20]     *See Mey v. Got Warranty, supra fn. 2*, 193 F. Supp. 3d at 645-47 (Intangible harms include "intrusion upon and occupation of the plaintiff's cell phone. … [and] intrusion upon another person's computerized electronic equipment …" Tangible harms, including the cost of electricity, "[w]hile certainly small, [are] real, and the cumulative effect could be consequential.").

caused text messages to be sent, automatically and without human intervention, to Plaintiff Wilson's cell phone using an ATDS.

68.     The text messages contained XFINITY Live! and/or 1100 Social's brand name and location, promoted specials and events at XFINITY Live! and/or 1100 Social, and/or encouraged Plaintiff Wilson to visit XFINITY Live! and/or 1100 Social with his friends or associates.

69.     The text messages sent by Defendants to Plaintiff Wilson were made for a commercial purpose and are advertisements and/or constitute telemarketing as defined by the TCPA.

70.     Defendants did not provide Plaintiff and the Class members with notice that they intended to send multiple autodialed, advertising, and/or telemarketing text messages to their cellular telephone numbers.

71.     Plaintiff and the Class members never provided prior express consent in writing, or otherwise, for Defendants to send such text messages to their cell phones by using an ATDS.

72.     In November 2010, Plaintiff registered his wireless number with the national do-not-call registry and received confirmation that his do-not-call registration would be effective as of December 7, 2010.

73.     Since the effective date of Plaintiff Wilson's registration on the national do-not-call list in December 2010 and between July 30, 2014 and April 4, 2018, Defendants have sent numerous advertising and/or telemarketing text messages to Plaintiff, at least two of which were within 12 months of one or more prior text messages.

74.     As a result of repeated and incessant advertising and/or telemarketing calls and text messages being made to his cell phone number, including those made by Defendants, in February 2017, Plaintiff applied for and received a new cell phone and cell phone number.

**FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF JOHN GALVAGNO**

75.     At all times relevant hereto, Plaintiff John Galvagno has paid a third-party provider for cellular telephone service and cellular data service on his personal cellular telephone, which has an area code specific to eastern Pennsylvania.

76.     Plaintiff Galvagno has visited and attended a happy hour at XFINITY Live! and/or 1100 Social.

77.     On multiple occasions in 2016 and 2017 (and at least twice within a twelve-month period), Defendants and/or their agents caused text messages to be sent, automatically and without human intervention, to Plaintiff Galvagno's cell phone using an ATDS.

78.     The text messages contained XFINITY Live! and/or 1100 Social's brand name and location, promoted specials and events at XFINITY Live! and/or 1100 Social, and/or encouraged Plaintiff Galvagno to visit XFINITY Live! and/or 1100 Social with his friends or associates.

79.     The text messages sent by Defendants to Plaintiff Galvagno were made for a commercial purpose and are advertisements and/or constitute telemarketing as defined by the TCPA.

80.     Defendants did not provide Plaintiff Galvagno with notice that they intended to send multiple autodialed, advertising, and/or telemarketing text messages to their cellular telephone numbers.

81.     Plaintiff Galvagno never provided prior express consent in writing, or otherwise, for Defendants to send such text messages to their cell phones by using an ATDS.

**FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF ERICA CRUZ**

82.     At all times relevant hereto, Plaintiff Erica Cruz has paid a third-party provider for cellular telephone service and cellular data service on her personal cellular telephone, which has

an area code specific to eastern Pennsylvania.

83.     Plaintiff Cruz has visited and attended a happy hour at XFINITY Live! and/or 1100 Social.

84.     On multiple occasions in 2016 and 2017 (and at least twice in a twelve-month period), Defendants and/or its agents caused text messages to be sent, automatically and without human intervention, to Plaintiff Cruz's cell phone using an ATDS.

85.     The text messages contained XFINITY Live! and/or 1100 Social's brand name and location, promoted specials and events at XFINITY Live! and/or 1100 Social, and/or encouraged Plaintiff Cruz to visit XFINITY Live! and/or 1100 Social with her friends or associates.

86.     The text messages sent by Defendants to Plaintiff Cruz were made for a commercial purpose and are advertisements and/or constitute telemarketing as defined by the TCPA.

87.     Defendants did not provide Plaintiff Cruz with notice that they intended to send multiple autodialed, advertising, and/or telemarketing text messages to their cellular telephone numbers.

88.     Plaintiff Cruz never provided prior express consent in writing, or otherwise, for Defendants to send such text messages to their cell phones by using an ATDS.

89.     If Defendants had advised Plaintiff Cruz and the Class members that they intended to incessantly send advertising and/or telemarketing text messages to their cellular phone numbers, and/or if Plaintiff Cruz and the Class members had not been required to provide their personal information in order to receive happy-hour discounts on food and drink, Plaintiff Cruz and the Class members would have expressly refused to provide their personal information to Defendants.

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs restate and incorporate by reference all paragraphs of this Complaint,

including all subparagraphs thereof.

91.     As to Count I for violation of the TCPA (the "227(b)(1)(A)(iii) Class"), Plaintiffs

bring this action on behalf of themselves and on behalf of a putative Class defined as:

> All persons and entities within the United States to whom Defendants (or a third party acting on Defendants' behalf) (1) sent a text message; (2) to his or her cellular telephone number; (3) that promoted XFINITY Live! and/or 1100 Social; (4) between July 30, 2014 to April 4, 2018.

92.     As to Count II for violation of the TCPA (the "64.1200(d) Class"), Plaintiffs bring

this action on behalf of themselves and on behalf of a putative Class defined as:

> All persons and entities within the United States to whom Defendants (or a third party acting on Defendants' behalf) (1) sent more than one text message; (2) to his or her cellular telephone number; (3) that promoted XFINITY Live! and/or 1100 Social; (4) between July 30, 2014 to April 4, 2018; and (5) within any twelve-month period.

93.     As to Count III for violation of the TCPA (the "227(c) Class"), Plaintiff Wilson

bring this action on behalf of themselves and on behalf of a putative class defined as:

> All persons and entities within the United States (1) whose cellular telephone number had been registered with the National Do-Not-Call Registry; and to whom Defendants (or a third party acting on Defendants' behalf) (2) sent more than one text message; (3) to his or her cellular telephone number; (4) that promoted XFINITY Live! and/or 1100 Social; (5) between July 30, 2014 to April 4, 2018; and (6) within any twelve-month period.

94.     The following people are excluded from the Classes: (1) any judge or magistrate

presiding over this action and members of their families; (2) Defendant, its subsidiaries, parents,

successors, predecessors, and any entity in which Defendants or its parents have a controlling

interest and its current or former employees, officers and directors; (3) persons who properly

execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this

matter have been finally adjudicated on the merits or otherwise released; (5) the parties' counsel;

and (6) the legal representatives, successors, and assigns of any such excluded persons.

95.    **Numerosity – Fed. R. Civ. P. 23(a)(1).** Plaintiffs do not know how many members are in the putative class but believes them to be in the tens of thousands, if not more.  On information and belief, the number of class members is so numerous that their individual joinder is impracticable.  The precise number of putative class members and their phone numbers can be obtained from information and records in the possession and control of Defendants or third parties acting on Defendants' behalf.

96.    **Existence and Predominance of Common Questions of Law and Fact – Fed. R. Civ. P. 23(a)(2) & 23(b)(3).** Common questions of law or fact exist as to all members within the putative class and predominate over any questions solely affecting any individual member.  The predominating common legal and factual questions, each of which may also be certified under Fed. R. Civ. P. 23(c)(4), include the following:

(a)    Whether Defendants and/or their agents used an ATDS to send text messages;

(b)    Whether the equipment used by Defendants, or a third party on Defendants' behalf, has the capacity to send text messages automatically, *i.e.*, without human intervention;

(c)    Whether Defendants' text messages are advertisements;

(d)    Whether Defendants' text messages constitute telemarketing;

(e)    Whether Defendants advised Plaintiffs and the class members that they intended to send autodialed, advertising, and/or telemarketing text messages to their cellular telephone numbers;

(f)    Whether Defendants obtained prior express consent, written or otherwise,

to send autodialed, advertising, and/or telemarketing text messages to the cellular telephone numbers of Plaintiffs and the class members;

(g)     Whether Defendants' text messages were sent for an emergency purpose;

(h)     Whether Defendants' text messages were sent willfully or knowingly;

(i)     Whether Defendants (i) established and implemented written procedures to comply with the national do-not-call rules; (ii) trained their personnel in procedures established pursuant to the national do-not-call rules; (iii) maintained a list of telephone numbers Defendants may not contact; (iv) employed a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call or text is made; and (v) maintained records documenting this process;

(j)     Whether Defendants (i) established and implemented written procedures to comply with the internal do-not-call rules; (ii) trained their personnel in procedures established pursuant to the internal do-not-call rules; (iii) maintained an internal list of telephone numbers Defendants may not contact; (iv) employed a version of the internal do-not-call list containing numbers updated no more than 30 days prior to the date any call is made; and (v) maintained records documenting this process; and/or

(k)     Whether, and to what extent, class members are entitled to equitable relief, including declaratory relief, a preliminary injunction, and/or permanent injunction.

97.     **Typicality – Fed. R. Civ. P. 23(a)(3).**  Plaintiffs' claims are typical of the claims of the putative classes he seeks to represent.  The factual and legal bases of Defendants' liability

to Plaintiffs is the same for all putative class members: (i) Defendants violated the TCPA by using an ATDS to send text messages without obtaining prior express written consent in writing or otherwise; (ii) Defendants violated the TCPA by sending multiple promotional text messages without complying with the requirements of 47 C.F.R. § 64.1200(d) and/or 47 U.S.C. § 227(c).

98.     **Adequacy of Representation – Fed. R. Civ. P. 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the putative class members. Plaintiffs have no interests that might conflict with the interests of the putative class members. Plaintiffs will pursue the claims vigorously, and Plaintiffs have retained counsel competent and experienced in TCPA class actions and complex litigation.

99.     **Superiority – Fed. R. Civ. P. 23(b)(3).** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual class members is small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for class members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

<u>**COUNT I**</u>
**VIOLATIONS OF THE TCPA, 47 U.S.C. § 227(b)(1)(A)(iii)**

100.    Plaintiffs restate and incorporate by reference all paragraphs of this Complaint, including all subparagraphs thereof.

101.    Defendants and/or their agents employed an ATDS to send non-emergency text messages, automatically and without human intervention, to the cellular or wireless telephones of Plaintiffs and the members of 227(b)(1)(A)(iii) Class.

102.    Defendants never obtained prior express consent in writing, or otherwise, advising Plaintiffs or the members of the 227(b)(1)(A)(iii) Class that they intended to send autodialed, advertising, and/or telemarketing text messages to their cellular or wireless telephones.

103.    As a result of Defendants' conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and the 227(b)(1)(A)(iii) Class were harmed and are entitled to a minimum of $500 in damages for each unlawful text message.

104.    Plaintiffs and the 227(b)(1)(A)(iii) Class are also entitled to an injunction against future calls.  47 U.S.C. § 227(b)(3).

105.    Defendants' text messages were willful and knowing, in that Defendants knew they were obtaining and storing cellular telephone numbers and employing equipment that would send autodialed, advertising, and/or telemarketing text messages to such numbers; Defendants intended that such equipment would in fact send automated text messages containing the XFINITY Live! and/or 1100 Social brand name and location, and promoting specials and events at XFINITY Live! and/or 1100 Social;  and Defendants knew that they had not obtained prior express consent in writing, or otherwise, from Plaintiffs or any of the putative class members to send such text messages.

106.    "Willful … means that the violator knew that he was doing the act in question. …

A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance." *In re Dynasty Mtg*., *L.L.C*., 22 FCC Rcd. 9453, 9470 & fn. 86 (May 14, 2007) (citations omitted).

107.    Because Defendants' misconduct was willful and knowing, the Court should treble the amount of statutory damages recoverable by the Plaintiffs and putative class members.

**COUNT II**
**VIOLATIONS OF THE TCPA, 47 C.F.R. § 64.1200(d)**

108.    Plaintiffs restate and incorporate by reference all paragraphs of this Complaint, including all subparagraphs thereof.

109.    Defendants' text messages were made for a commercial purpose, in that they contain the brand name and location of XFINITY Live! and/or 1100 Social, they promote specials and events at XFINITY Live! and/or 1100 Social, and/or they encourage Plaintiffs and the putative class members to visit XFINITY Live! and/or 1100 Social with their friends or associates.

110.    Defendants sent more than one advertising and/or telemarketing text message within any twelve-month period to Plaintiffs and the 64.1200(d) Class even though Defendants did not first institute procedures for initiating telemarketing calls or text messages that meet (or exceed) the following minimum standards:

- Written policies and procedures, available upon demand, for maintaining a do-not-call list;

- Policies and procedures for the training of personnel engaged in any aspect of telemarketing, on the existence and use of the do-not-call list;

- Policies and procedures for the recording of any request not to receive calls, at the time the request is made, including the subscriber's name, if provided, and telephone number, and honoring any such requests within a reasonable time from the date such request is made.

- Policies and procedures for employing a version of the internal do-not-call list containing numbers updated no more than 30 days prior to the date any call is made;

- Policies and procedures for providing the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted; and

- Policies and procedures for maintaining records documenting this process, for a period of not less than 5 years.

111.    On information and belief, Defendants are not tax-exempt nonprofit organizations and are therefore required to comply with the minimum standards set forth in 47 C.F.R. § 64.1200(d).  *See* 47 C.F.R. § 64.1200(d)(7).

112.    On information and belief, Defendants did not implement any of the minimum standards required by 47 C.F.R. § 1200(d)(1)-(6).

113.    Defendants' text messages do not sufficiently identify the name of the individual caller, and do not provide a (working) telephone number[21] or address at which the person or entity may be contacted.

114.    As a result of Defendants' conduct and pursuant to Section 227(c)(5) of the TCPA, Plaintiffs and the 64.1200(d) Class were harmed and are entitled to a minimum of $500 in damages for each unlawful text message.

115.    Plaintiffs and the 64.1200(d) Class are also entitled to an injunction against future calls.  47 U.S.C. § 227(c)(5).

116.    Defendants' text messages were willful and knowing, in that Defendants knew they

---

[21]    Defendants' text messages do not provide a telephone number, toll-free or otherwise, for consumers and businesses to call in order to opt out of future text messages.  Additionally, if you call the telephone numbers Defendants used to send a text message to Plaintiff cellular telephone number, you are greeted with a message that states, "Unable to complete this call as dialed.  Please check the number and call again."

were sending advertising and/or telemarketing text messages to the cellular telephone numbers of Plaintiffs and the Class members without first implementing procedures required by 47 C.F.R. § 64.1200(d), but Defendants chose to send such text messages anyways.

117.     "Willful … means that the violator knew that he was doing the act in question. . . . A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance."  *In re Dynasty Mtg., L.L.C.*, 22 FCC Rcd. 9453, 9470 & fn. 86 (May 14, 2007) (citations omitted).

118.     Because Defendants' misconduct was willful and knowing, the Court should treble the amount of statutory damages recoverable by the Plaintiffs and putative class members.

### COUNT III
### VIOLATIONS OF THE TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2)

119.     Plaintiffs restate and incorporate by reference all paragraphs of this Complaint, including all subparagraphs thereof.

120.     Defendants' text messages were made for a commercial purpose, in that they contain the brand name and location of XFINITY Live! and/or 1100 Social, they promote specials and events at XFINITY Live! and/or 1100 Social, and/or they encourage Plaintiffs and the putative class members to visit XFINITY Live! and/or 1100 Social with their friends or associates.

121.     Defendants sent more than one advertising and/or telemarketing text message within any twelve-month period to Plaintiffs and the 227(c) Class after their telephone numbers had been registered on the national do-not-call registry for more than 31 days.

122.     These advertising and/or telemarketing text messages were made even though Defendants did not obtain prior express consent in writing, or otherwise, to send such text messages to Plaintiffs or the 227(c) Class.

123.     As a result of Defendants' conduct and pursuant to Section 227(c)(5) of the TCPA,

Plaintiffs and the 227(c) Class were harmed and are entitled to $500 in damages for each violation.

124.    Plaintiffs and the 227(c) Class are also entitled to an injunction against future calls. 47 U.S.C. § 227(c)(5).

125.    On information and belief, Defendants failed to (i) establish and implement written procedures to comply with the national do-not-call rules; (ii) train their personnel in procedures established pursuant to the national do-not-call rules; (iii) maintain a list of telephone numbers Defendants may not contact; (iv) employ a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and (v) maintain records documenting this process.

126.    On information and belief, Defendants failed to honor the national do-not-call registry, failed to provide "an interactive opt-out mechanism" by which Plaintiffs and the 227(c) Class could opt out of future calls, and failed to maintain an "automated, interactive voice- and/or key press-activated opt-out mechanism" by which Plaintiffs and the 227(c) Class could call a separate toll-free number and add their numbers to Defendants' internal do-not-call list.

127.    Defendants' text messages were willful and knowing, in that Defendants knew they were sending advertising and/or telemarketing text messages to the cellular telephone numbers of Plaintiffs and the class members registered on the national do-not-call list, but Defendants chose to send such text messages anyway.

128.    "Willful … means that the violator knew that he was doing the act in question. … A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance." *In re Dynasty Mtg., L.L.C.*, 22 FCC Rcd. 9453, 9470 n. 86 (May 14, 2007) (citations omitted).

129.    Because Defendants' misconduct was willful and knowing, the Court should treble

the amount of statutory damages recoverable by the Plaintiffs and putative class members.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs Thomas Wilson, John Galvagno, and Erica Cruz, individually and on behalf of the Class, pray for the following relief:

(a)    An order certifying the Classes as defined above, appointing Plaintiffs as the representatives of the Classes, and appointing their counsel as Class Counsel;

(b)    An order declaring that Defendant's actions, as set out above, violate the TCPA;

(c)    An order declaring that the telephone calling equipment used to send the text messages at issue here constitutes an automatic telephone dialing system under the TCPA;

(d)    An injunction requiring Defendants to cease all unlawful text message activities and enjoining Defendants from using automated or computerized dialing equipment to place text message calls without consent;

(e)    An award of statutory, and treble damages;

(f)    An Award of reasonable attorneys' fees and costs; and

(g)    Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims that are so triable.

Date: December 12, 2018

                                       */s/ Stephen J. Nolan*
                                        Stephen J. Nolan, Esquire
                                        **SMITH, GILDEA & SCHMIDT, LLC**
                                        600 Washington Avenue, Suite 200
                                        Towson, MD 21204
                                        410-821-0070
                                        410-821-0071 (fax)
                                        snolan@sgs-law.com

                                        David D. Langfitt, Esquire
                                        Michael B. Leh, Esquire
                                        **LOCKS LAW FIRM**
                                        601 Walnut Street, Suite 720 East
                                        Philadelphia, PA 19106
                                        215-893-0100 (tel.)
                                        215-893-3444 (fax)
                                        mleh@lockslaw.com
                                        dlangfitt@lockslaw.com

                                        William C. Kenney     (*pro hac vice*)
                                         **BILL KENNEY LAW FIRM, LLC**
                                        1100 Main Street, Suite 1800
                                        Kansas City, MO 64105
                                        (816) 842-2455 (tel.)
                                        (816) 474-8899 (fax)
                                        bkenney@billkenneylaw.com

                                        *and*

                                        Ari N. Rodopoulos     (*pro hac vice*)
                                        **WOOD LAW FIRM, LLC**
                                        1100 Main Street, Suite 1800
                                        Kansas City, MO 64105-5171
                                        (816) 256-3582 (tel.)
                                        (816) 337-4243 (fax)
                                        ari@woodlaw.com

                                        *Attorneys for Plaintiff and all others*
                                        *similarly situated*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 12, 2018, the foregoing document was electronically filed with the Court's Electronic Filing System and will be served electronically on all registered attorneys of record.

*/s/ Bill Kenney*
William C. Kenney
