IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THOMAS WILSON, JOHN GALVAGNO,       :
and ERICA CRUZ, individually
and on behalf of all others         :
similarly situated
                                    :

    v.                              :   Civil Action No. DKC 18-3285

                                    :

PH PHASE ONE OPERATIONS L.P.
d/b/a XFINITY Live! Philadelphia:
1100 Social, et al.
                                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case
brought under the Telephone Consumer Protection Act, 47 U.S.C. §
227 ("TCPA"), is a motion to dismiss filed by Defendants PL Phase
One Operations L.P., The Cordish Companies, Inc. ("Cordish"),
Entertainment Consulting International, LLC ("ECI"), and PL Phase
One Operations, G.P., Inc. (collectively, "Defendants"). (ECF No.
32). The issues have been fully briefed, and the court now rules,
no hearing being deemed necessary. Local Rule 105.6. For the
following reasons, Defendants' motion to dismiss will be denied in
part and granted in part.

## I. Background

The following facts are set forth in the Amended Complaint,
and construed in the light most favorable to Plaintiffs. Cordish
owns and manages over fifty restaurants, bars, and live music

venues. (ECF No. 25 ¶ 41). Xfinity Live! is a large entertainment complex in downtown Philadelphia that Cordish owns and manages. (*Id.* ¶¶ 6 & 42). 1100 Social is a bar located within Xfinity Live! (*Id.* ¶ 7). Cordish created two partnerships to hold the assets of these venues — Defendants PL Phase One Operations L.P., and PL Phase One Operations, G.P., Inc. (*Id.* ¶¶ 5-6). Plaintiffs allege that, despite the presence of these holding companies, Cordish itself possesses the final say over any day-to-day operating decisions, including those regarding advertising. (*Id.* ¶¶ 7, 41-42). Cordish established ECI to manage advertising at all Cordish establishments. (*Id.* ¶ 43). Cordish uses ECI to implement marketing for all of its venues, including Xfinity Live! and 1100 Social. (*Id.* ¶ 44).

Plaintiffs Thomas Wilson, John Galvagno, and Erica Cruz attended a happy hour at Xfinity Live! (ECF No. 25, at 17). Plaintiffs provided Defendants with their personal information, including cellular telephone ("cell phone") numbers, to receive happy-hour discounts on food and drink. (*Id.*, at 20). Plaintiffs allege that on multiple occasions in 2015, 2016, and 2017, Defendants caused text messages to be sent to Plaintiffs' cell phones using an automatic telephone dialing system ("ATDS"). (*Id.*, at 18). Plaintiffs contend that these messages were sent through an online texting platform known as "TXT Live!," which Cordish developed. (*Id.* ¶¶ 46 & 50). TXT Live! is accessed through the

"ECI Contact App." (*Id.* ¶ 47). To use the messaging portal of TXT Live!, Defendants' employees upload CSV files containing consumers' cell phone numbers and compose promotional text messages to send to the numbers within the CSV file. (*Id.* ¶¶ 47 & 48). The software is programmed randomly to select phone numbers from the CSV files for advertising campaigns and automatically to send the relevant text messages to those cell phones. (*Id.* ¶¶ 55 & 56). The text messages contained Xfinity Live! and 1100 Social's brand names, locations, and promotions of specials and events. (*Id.*, at 18). Plaintiffs allege that some of these promotional text messages were sent at least twice within a twelve-month period. Despite registering his phone number on the do-not-call registry in 2010, Plaintiff Wilson continued to receive the alleged messages. Plaintiffs were not provided notice that they would receive promotional text messages and did not give express written consent in writing to receive such messages.

Plaintiffs contend that these messages violate two sections of the TCPA: 42 U.S.C. § 227(b)(1)(A)(iii), prohibiting companies from making any call using an ATDS to a cell phone; and § 227(c), violations of the Federal Communication Commission's ("FCC") rules requiring companies to establish and maintain company-specific do-not-call lists and to adhere to the do-not-call registry.

Additionally, all Plaintiffs allege a claim under 47 C.F.R. § 64.1200(d) and Plaintiff Wilson alleges a claim under § 64.1200(c).

Plaintiffs filed a complaint in the Circuit Court for Baltimore County on July 30, 2018 against PL Phase One Operations L.P. (ECF No. 1). That defendant removed the action to federal court on October 24, 2018 and filed a motion to dismiss for lack of personal jurisdiction on November 7, 2018 (ECF No. 9). Plaintiffs filed an amended complaint on December 13, 2018, adding the three other defendants. (ECF No. 25). Defendants filed a motion to dismiss the first amended complaint on January 28, 2019 (ECF No. 32), and a contemporaneous notice of constitutional question pursuant to Federal Rule of Civil Procedure 5.1(a) (ECF No. 32-2). Plaintiffs responded on March 14, 2019 (ECF No. 39), and Defendants replied on April 10, 2019 (ECF No. 46). The United States of America ("United States") filed a notice of intervention pursuant to Federal Rules of Civil Procedure 5.1(c) and 24(a)(1) for the limited purpose of defending the constitutionality of the TCPA on July 22, 2019. (ECF No. 52). The United States contemporaneously filed a memorandum of law in support of the constitutionality of the TCPA on July 22, 2019. (ECF No. 53).

Defendants replied to the memorandum of United States on August 9, 2019. (ECF No. 57).

## II.  Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.*

## III. Analysis

### A. Adoption by Reference

Before Plaintiffs filed their first amended complaint, Defendant PL Phase One Operations L.P. d/b/a Xfinity Live! filed a motion to dismiss for lack of personal jurisdiction. (ECF No. 9). Plaintiffs did not respond to the motion to dismiss, but instead filed a first amended complaint. In the first amended complaint, Plaintiffs added the Maryland defendants and factual allegations to support that the contacts of PL Phase One Operations L.P. with Maryland are substantial enough to support personal jurisdiction. Instead of addressing any personal jurisdiction issues not remedied by Plaintiffs first amended complaint, Defendants filed a consolidated motion to dismiss, simply "incorporating" the arguments advanced in the original motion to dismiss. Thus, PL Phase One Operations L.P. makes no effort to update its challenge to personal jurisdiction in the face of new factual allegations linking PL Phase One Operations L.P. to Maryland. Phase One Operations L.P. cites no authority for its incorporation position.

Rule 10(c) provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." Although Rule 10 instructs the form of

pleadings, "[a] few federal courts have allowed defendants to incorporate by reference to prior motions made in the action, even though Rule 10(c) does not contemplate the incorporation of statements from prior motions (only statements 'in a pleading' may be adopted by reference elsewhere)." 5A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1326 (4th ed. 2019)(further noting that motions are not pleadings). The difficulty in this case is that the allegations in the amended complaint affect the arguments made in the original motion and it is not the role of the court to try to discern which, if any, arguments still apply. Thus, PL Phase One Operations L.P.'s argument concerning a lack of personal jurisdiction will not be considered.

## B. The TCPA

"Enacted in 1991, the TCPA was a response by Congress to the reactions of American consumers over intrusive and unwanted phone calls." *Am. Ass'n of Political Consultants, Inc. v. Fed. Commc'ns Comm'n*, 923 F.3d 159, 161–62 (4th Cir. 2019) ("*AAPC*"). The automated call ban prohibits phone calls to cell phones that use "any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). Text messages qualify as "calls" under the TCPA. *See Campbell-Ewald v. Gomez*, 136 S.Ct. 663, 667 (2016). Congress also authorized the FCC to

implement rules and regulations enforcing the TCPA. 47 U.S.C. §
227(b)(2).

An "automatic telephone dialing system" is defined as
equipment that "has the capacity (A) to store or produce telephone
numbers to be called, using a random or sequential number
generator, and (B) to dial such numbers." *See id.* § 227(a)(1).
The automated call ban does not, however, prohibit automated calls
to cell phones initiated (1) "for emergency purposes," *see* 47
U.S.C. § 227(b)(1)(A); (2) with "the prior express consent of the
called party," *id.*; or (3) "by the federal government itself,"
*AAPC*, 923 F.3d at 162. Thus, to state a claim under the TCPA, "a
plaintiff must allege: (1) that the defendant called the
plaintiff's cellular telephone; (2) using an automatic telephone
dialing system; [and] (3) without the plaintiff's prior express
consent." *Hossfeld v. Gov't Employees Ins. Co.*, 88 F.Supp.3d 504,
510 (D.Md. 2015).

Certain agency principles apply to the TCPA, according to the
FCC:

> In 2013, the FCC issued a declaratory ruling
> clarifying the meaning of "to initiate" a call
> under the TCPA. *In re Joint Petition filed by
> Dish Network, LLC*, 28 FCC Rcd. 6574 (2013).
> The FCC determined "that a person or entity
> [']initiates['] a telephone call when it takes
> the steps necessary to physically place a
> telephone call, and generally does not include
> persons or entities, such as third-party
> retailers, that might merely have some role,
> however minor, in the causal chain that

results in the making of a telephone call."
*Id.* at 6583. There is "clear distinction
between a call that is made by a seller and a
call that is made by a telemarketer on the
seller's behalf." *Id.* Thus, a seller is only
directly liable when it places the call.[]

. . .

The FCC did recognize that "one can imagine a
circumstance in which a seller is so involved
in the placing of a specific telephone call as
to be directly liable for initiating it—by
giving the third party specific and
comprehensive instructions as to timing and
the manner of the call, for example." *In re
Dish Network*, 28 FCC Rcd. at 6583; *see also
Maryland v. Universal Elections, Inc.*, 729
F.3d 370, 375–80 (4th Cir. 2013) (defendants
directly liable for "creating" and
"distributing" a message even though a third-
party system actually relayed the calls).

. . .

However, a seller cannot avoid liability
simply by delegating placing the call to a
third-party. The FCC determined that "while
a seller does not generally 'initiate' calls
made through a third-party telemarketer within
the meaning of the TCPA, it nonetheless may be
held vicariously liable under federal common
law principles of agency for violations of []
section 227(b) . . . that are committed by
third-party telemarketers." *See id.* at 6574.
This includes "a broad range of agency
principles, including not only formal agency,
but also principles of apparent authority and
ratification."[] *Id.* at 6584.

*Id.* & n.10.

Defendants contend that Plaintiffs fail to state a claim

because "the [first amended complaint] fails to allege any specific

conduct against any specific Defendant[.]" (ECF No. 32-1, at 29).

Defendants specifically assert that "Plaintiffs fail to attribute that any single text message was sent by any specific Defendant to one of Plaintiffs." (*Id.*).

Plaintiffs contend that they received several text messages on their cell phones advertising Xfinity Live! and 1100 Social, that Defendants used an online texting platform known as TXT Live!, developed by Cordish and accessed through the ECI Contact App., and that TXT Live! allows Defendants to send text messages, *en masse*, to numerous individuals. Plaintiffs detail Defendants' interlocking corporate structure and attribute specific roles to each Defendant where feasible. Defendants argue that Plaintiffs' allegations are deficient. This fact based issue requires a common sense assessment of the available information and may turn on whether the plaintiff has made a sufficient pre-filing investigation. At times, the so-called missing information is exclusively within a defendant's knowledge. Compare *Kramer v. Autobytel, Inc.*, 759 F.Supp.2d 1165, 1171 (N.D.Cal. 2010) (rejecting argument that complaint insufficiently described each defendant's role in violating the TCPA, noting that plaintiff adequately alleged a violation of the TCPA and "described the relationship" between the defendants), with *Armstrong v. Investor's Business Daily, Inc.*, 2018 WL 6787049 *9 (C.D. Calif. December 21, 2018)(finding allegations insufficient when two of the undifferentiated "defendants" were unrelated to others.)

Here, Plaintiffs adequately allege the interrelationship among all defendants and outline the role played by each.

Defendants also argue that, to "the extent Plaintiffs [] attempt[] to hold the Maryland Entities liable for the text messages allegedly sent to the Plaintiffs by Xfinity-Philadelphia, Plaintiffs have not adequately alleged such a theory of liability." (ECF No. 32-1, at 30). A "defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd*, 136 S.Ct. 663 (2016). In the TCPA context, to determine the general common law of agency, courts look to the Restatement of Agency. *Id.* at 878; *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997) ("To determine the general common law of agency, the [Supreme] Court notes that it has traditionally looked to sources such as the Restatement of Agency"). According to the Restatement, the "essential element" of an agency relationship is the principal's control over the agent's actions. Restatement (Third) of Agency, § 1.01 cmt. f. Agency may be established by express authorization, implicit authorization, or ratification. *Id.* at §§ 2.01, 2.03, 4.01. In the TCPA context, courts characterize the control necessary to establish agency as whether the principal "controlled or had the right to control [the agent] and, more specifically,

the manner and means of the text message campaign they conducted."
*Thomas v. Taco Bell Corp.*, 879 F.Supp.2d 1079, 1084 (C.D.Cal.
2012), *aff'd*, 582 F.App'x 678 (9th Cir. 2014).  When an agency
relationship exists, the scope of the agent's authority may be
implied by conduct.  *See* Restatement (Third) of Agency, § 2.02
cmt. c.  The FCC has recognized, for example, that

> a seller would be responsible under the TCPA
> for the unauthorized conduct of a third-party
> telemarketer that is otherwise authorized to
> market on the seller's behalf if the seller
> knew (or reasonably should have known) that
> the telemarketer was violating the TCPA on the
> seller's behalf and the seller failed to take
> effective steps within its power to force the
> telemarketer to cease that conduct.

*In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28
FCC Rcd. 6574, 6592 ¶ 46 n.138 (2013).  Importantly, "the existence
and scope of agency relationships are factual matters," typically
reserved for a jury.  *Metco Products, Div. of Case Mfg. Co. v.
N.L.R.B.*, 884 F.2d 156, 159 (4th Cir. 1989).

The complaint sets forth an agency relationship among the
Defendants.  At the top, Cordish wields say over any day-to-day
operating decisions, including those regarding advertising, while
ECI implements the advertising strategies to the various entities
at base.  (ECF No. 25 ¶¶ 7-8, 17, 43, 46).  Further, Plaintiffs
specifically allege that Cordish and ECI are responsible for TXT
Live!  (*Id.* ¶¶ 49-50).  ECI developed the policies and procedures
for creating text messaging campaigns and collecting lists of

consumers' names and phone numbers for use in telemarketing campaigns, while Cordish gives final approval over marketing, lists TXT Live! as one of its primary assets, and owns the domain names associated with TXT Live! (*Id.*).

Defendants next argue that Plaintiffs fail "sufficiently [to] plead . . . that an ATDS was actually used to text Plaintiffs." (ECF No. 32-1, at 33). Plaintiffs contend that they have alleged facts sufficient to show Defendants used an ATDS to text Plaintiffs and that courts "recognize [] plaintiffs are unlikely to be able to allege the particulars of any defendant's dialing software absent discovery." (ECF No. 39, at 29).

An "automatic telephone dialing system" is defined as equipment that "has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator, and (B) to dial such numbers."[1] *See* 47 U.S.C. § 227(a)(1).

Plaintiffs allege that they received "repeated and incessant" text messages in 2015, 2016, and 2017. (ECF No. 25, at 18). Plaintiffs contend that these messages were sent through an online texting platform known as "TXT Live!" (*Id.* ¶¶ 46 & 50). To use the messaging portal of TXT Live!, Defendants' employees upload CSV files containing consumers' cell phone numbers and compose

---

[1] The definition of an ATDS will be evaluated further in addressing the constitutionality of the TCPA below.

promotional text messages to send to the numbers within the CSV file. (*Id.* ¶¶ 47 & 48). The software is programmed randomly to select phone numbers from the CSV files for advertising campaigns and to automatically send the relevant text messages to those cell phones. (*Id.* ¶¶ 55 & 56). These allegations detail the type of mass telemarketing that an ATDS is capable of and meet the statutory definition of an ATDS.

Defendants also lodge an affirmative defense, arguing that "Plaintiffs' established business relationship defeats their do not call claim[.]" (ECF No. 32-1, at 36) (internal capitalizations omitted). A motion to dismiss pursuant to 12(b)(6) does not generally permit an analysis of potential defenses a defendant may have to the asserted claims. However, dismissal may be appropriate when a meritorious affirmative defense is clear from the face of the complaint. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996) (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 250 (4th Cir. 1993)). It is clear from the complaint that Plaintiffs visited Defendants' establishments. It is not clear, however, that these messages — spanning over three years — were related to those visits, or whether Plaintiffs consented to receive them or terminated the relationship. *See* 47 C.F.R. 64.1200(f)(6) (defining "established business relationship" as "a prior or existing relationship formed by a voluntary two-way communication . . . which [] has not been previously terminated by

14

either party."). Thus, the complaint will not be dismissed due to an established business relationship.

Defendants maintain that Count II — violations of the TCPA, 47 C.F.R § 64.1200(d) — "fails because there is no private right of action to pursue that count." (ECF 32-1 at 35). The United States Court of Appeals for the Fourth Circuit has not addressed whether 47 C.F.R § 64.1200(d) provides a private right of action. Judge Bredar recently analyzed private rights of action under the TCPA in *Worsham v. Travel Options, Inc.*, No. 14-cv-2749-JKB, 2016 WL 4592373, at *4 (D.Md. Sept. 2, 2016), *aff'd*, 678 F.App'x 165 (4th Cir. 2017):

> The TCPA permits a person to institute a private action based on a violation of subsection *b* and the regulations prescribed under that subsection "to enjoin such violation [and/or] . . . to receive $500 in damages for each such violation," § 227(b)(3); as well, subsection *c* grants a right of private action to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under [subsection *c*] . . . to enjoin such violation [and/or] . . . to receive up to $500 in damages for each such violation," § 227(c)(5). No private right of action is granted under any other subsection of § 227.

> The FCC is charged with the responsibility of prescribing regulations to implement the requirements of the TCPA's various subsections and, accordingly, has promulgated regulations codified at 47 C.F.R. § 64.1200. The FCC has addressed the specific concerns expressed in subsection *b* within § 64.1200(a), and it has addressed those expressed in subsection *c*

15

within § 64.1200(c). What the FCC has
prescribed in § 64.1200(b) implements
subsection *d* of the TCPA, which mandates
regulations for technical and procedural
standards for telephone calls initiated by an
automatic telephone dialing system or calls
using an artificial or prerecorded voice
system; likewise, the requirements of §
64.1200(d) set forth the procedural standards
for telemarketers to maintain their own,
company-specific, do-not-call lists and,
consequently, appear to fall under the aegis
of subsection *d* of the TCPA.

Judge Bredar's analysis is persuasive and applicable here. The
TCPA provides a private right of action under subsections *b* and *c*.
47 C.F.R § 64.1200(d) appears to fall within subsection *d*'s scope,
which does not provide a private right of action. Accordingly,
Count II will be dismissed.

## C. Constitutionality of the TCPA

After Defendants filed their motion to dismiss, but before
the United States intervened, the United States Court of Appeals
for the Fourth Circuit issued an opinion holding the government-
debt exception unconstitutional but severable from the remainder
of the TCPA's autodialer provision, 47 U.S.C. § 227(b)(1)(A)(iii).
*See AAPC*, 923 F.3d 159. Absent the government-debt exception, the
Fourth Circuit made clear that the TCPA's autodialer provision
remains intact. *Id.* at 171. *AAPC* controls Defendants' primary
argument against the TCPA's constitutionality. Defendants'
remaining constitutional challenges are a void for vagueness
challenge to the TCPA's definition of an automated telephone

16

dialing system, and a First Amendment challenge to the TCPA's definition of "telephone solicitation."

### 1. Void for vagueness

Defendants contend that the "ATDS restriction under the TCPA is [] unconstitutional under the [] concept of 'void for vagueness'" in violation of the Due Process Clause of the Fifth Amendment. (ECF No. 32, at 26). Defendants specifically argue that the "TCPA is unconstitutionally vague with respect to calls made to cellular phones using an ATDS because it fails to give a person of ordinary intelligence adequate notice regarding precisely what equipment qualifies as an ATDS." (*Id.*, at 27).

"A statute is unconstitutionally vague if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement." *United States v. Saunders*, 828 F.3d 198, 206 (4th Cir. 2016) (citation omitted). "In assessing the existence of fair notice, we consider 'whether a statute's prohibitions are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.'" *Id.* (quoting *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012)). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Estates v.*

*Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). "The Court has [] expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* "Striking down ordinances (or exceptions to the same) as facially void for vagueness is a disfavored judicial exercise. . . . [T]here will be hard cases under any law. . . [and i]t is preferable for courts to demonstrate restraint by entertaining challenges to applications of a law as those challenges arise." *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998).

As applied above, an "automatic telephone dialing system" is defined as equipment that "has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator, and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The various United States courts of appeals differ as to whether the definition of an ATDS encompasses predictive dialers and is limited to devices with a present capacity, opposed to a potential capacity, for autodialing. These struggles, however, do not affect the ATDS here, which is alleged to have a present capacity for autodialing. *See Duguid v. Facebook, Inc.*, 926 F.3d 1146, 1149 (9th Cir. 2019); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018), *cert. dismissed*, 139 S.Ct. 1289 (2019); *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 690 (D.C. Cir. 2018); *King v.*

*Time Warner Cable Inc.*, 894 F.3d 473, 474 (2ᵈ Cir. 2018); *Dominguez v. Yahoo, Inc.*, 629 F.App'x 369, 373 (3ᵈ Cir. 2015).

The decision of the United States Court of Appeals for the District of Columbia Circuit in *ACA International* held that a past FCC ruling — not the statute itself — generated uncertainty, and it vacated the rulings that were the source of confusion. Moreover, after the D.C. Circuit struck down the FCC's interpretation of an ATDS, the United States Courts of Appeal for the Ninth and Third Circuits applied statutory standards of interpretation, deriving workable definitions of an ATDS. *See Yahoo, Inc.*, 894 F.3d at 119; *Marks*, 904 F.3d at 1049–52 ("Because the statutory language is ambiguous, we look at the context and the structure of the statutory scheme."); *Duguid*, 926 F.3d at 1150 (confirming that *Marks*'s construction of the ATDS definition "clarif[ied] any ambiguity" about the provision after *ACA International* "wipe[d] the definitional slate clean"). Moreover, Defendants' contention that the FCC does not currently have a regulation interpreting the statutory definition is unpersuasive. The TCPA was in effect for more than ten years with only the statutory definition to guide enforcement. *See Marks*, 904 F.3d at 1045 (indicating that from the statute's promulgation in 1991 until 2003, no FCC order dealt with the definition of an ATDS except for a regulation "merely track[ing] the statutory definition"); *see also Saunders*, 828 F.3d at 207 (noting, in rejecting a vagueness

19

challenge, that the statute's core "prohibition . . . has been on the books and readily comprehensible to those in the . . . industry (much less the general population) for over a quarter-century"); *AACP*, 923 F.3d at 171 ("For twenty-four years, from 1991 until 2015, the automated call ban was 'fully operative.'") (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 509 (2010)). Thus, although technical, the TCPA's definition of an ATDS is set out in terms that an ordinary person exercising ordinary common sense can understand sufficiently and comply with. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (finding that an ordinance's language lacking "mathematical certainty" was not vague because "it is clear what the ordinance as a whole prohibits.")

Defendants' as-applied challenge, that "a web-based platform [] could not send text messages without manual input from a human being," is similarly unpersuasive. (ECF No. 32-1, at 28). Indeed, the TCPA contemplates some amount of human input — a list cannot be generated or uploaded to dialing software without some effort on the part of a human being, nor can a dialing program be started without human input. The statute prohibits calls made by software with the capacity to store or produce telephone numbers to be called, using a random or sequential number generator. 47 U.S.C. § 227(a)(1). Plaintiffs allege that TXT Live! is such a device in

the complaint.  Accordingly, the TCPA's definition of an ATDS is not unconstitutionally vague.

### 2.  Telephone solicitation definition

Defendants' final constitutional challenge to the TCPA pertains to Plaintiffs claim that Defendants sent text messages to Plaintiffs despite their presence on the national do-not-call-registry in violation of 47 U.S.C. §§ 227(c)(1)-(3) and 47 C.F.R. § 64.1200(c)(2).  Defendants specifically assert that the definition of telephone solicitation contains content-based distinctions as well as "speaker-based exemptions [because] [it] do[es] not apply to non-profits."  (ECF No. 32-1, at 14).  Defendants contend that the exclusion of non-profit organizations requires a strict scrutiny analysis which the TCPA cannot withstand.  (ECF No. 32-1, at 23).  Defendants also argue that this definition violates their equal protection rights under the Fourteenth Amendment to the United States Constitution.  (ECF No. 32-1, at 26).  Because "the equal protection claim in this case is closely intertwined with First Amendment interests," it will also be addressed here. *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

If the definition of telephone solicitation is a content-based speech restriction, it would be subject to strict scrutiny review. *AAPC*, 923 F.3d at 165.  However, if the definition constitutes a content-neutral speech restriction, it would be

subject to intermediate scrutiny analysis. *Id.* As discussed above, Section 227(c)(5) of the TCPA imposes liability if an entity places more than one "telephone solicitation" in a twelve-month period to an individual, absent an exception to the TCPA. The term "telephone solicitation" means

> the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

47 U.S.C. § 227(a)(4). This definition is content neutral because it does not "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2222 (2015). On its face, this definition allows for non-profits to initiate a telephone solicitation, but proscribes private parties from initiating the same, absent express permission or an established business relationship. This definition does not control or affect the content of the message; it prohibits how private entities may initiate the same messages nonprofit organizations are permitted to send. Thus, strict scrutiny is not warranted. *See id.* at 2230 (strict scrutiny is warranted only "when the legislature's speaker preference reflects a content preference") (quoting *Turner Broad.*

*Sys. v. FCC*, 512 U.S. 622, 658 (1994)); *see also Turner*, 512 U.S. at 657 ("To the extent appellants' argument rests on the view that all regulations distinguishing between speakers warrant strict scrutiny, it is mistaken.") (citation omitted).    Defendants cite to *Mosely*, *Carey v. Brown*, 447 U.S. 455 (1980), and *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011), arguing that strict scrutiny is warranted under an equal protection analysis.    These cases are distinguishable, however, as they all dealt with speech restrictions based on subject matter.    *See Mosely*, 408 U.S. at 2290 ("the central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter."); *Carey*, 447 U.S. at 460 ("On its face, the Act accords preferential treatment to the expression of views on one particular subject"); *Brown*, 564 U.S. at 799 ("the Act imposes a restriction on the content of protected speech"); *see also Stuart v. Camnitz*, 774 F.3d 238, 245 (4th Cir. 2014) ("the intermediate scrutiny standard [is] normally used for [] commercial speech regulations.").

The Fourth Circuit has discussed the interplay between intermediate scrutiny and the TCPA:

> A content-neutral law that regulates speech is valid if "it furthers an important or substantial governmental interest . . . [that] is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).    "To satisfy this

> standard, a regulation need not be the least
> speech-restrictive means of advancing the
> Government's interests." *Turner*, 512 U.S. at
> 662. Instead, the regulation simply cannot
> "burden substantially more speech than is
> necessary to further the government's
> legitimate interests." *Id*. (quoting *Ward v.
> Rock Against Racism*, 491 U.S. 781, 799
> (1989)).

*Maryland v. Universal Elections*, 729 F.3d at 376. The United

States argues that the TCPA's do-not-call provisions withstand

intermediate scrutiny because "the provisions allow the FCC to

promulgate rules aimed at curbing for-profit telephone

solicitation – conduct that impedes consumers' personal and

residential privacy – and to do so in a manner that targets only

the type of solicitation deemed most intrusive[.]" (ECF No. 53,

at 24). To support this contention, the United States cites to

*AAPC*, 923 F.3d at 168, in which the Fourth Circuit assumed for

analysis that "protecting personal and residential privacy" is a

compelling government interest, as well as *Maryland v. Universal

Elections*, 729 F.3d at 377, in which the Fourth Circuit held that

residential privacy satisfies intermediate scrutiny as to another

provision of the TCPA. The United States also cites a litany of

district court opinions for the proposition that "every court to

consider the TCPA's autodialer provision, including its 2015

amendment, has concluded that it serves a compelling interest."

(*See* ECF No. 53, at 25 n.9); *see, e.g.*, *Gallion v. Charter Commc'ns

Inc.*, 287 F.Supp.3d 920, 928 (C.D.Cal. 2018) ("The Court agrees

with plaintiff, the government, and the consensus view among district courts that the TCPA serves a compelling government interest in protecting residential privacy from the nuisance of unsolicited, automated telephone calls."). Upon review, the United States is correct, and Defendants cite no case to the contrary. Thus, the TCPA's definition of "telephone solicitation" is constitutional.

### D. Stay pending FCC determination of ATDS definition

Defendants argue that a stay is warranted under the primary jurisdiction doctrine because the FCC is actively considering how to interpret and apply the definition of an ATDS. (ECF No. 32-1, at 40). The primary jurisdiction doctrine applies "in circumstances in which federal litigation raises a difficult, technical question that falls within the expertise of a particular agency." *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., MD*, 268 F.3d 255, 262 n.7 (4th Cir. 2001). The stay is discretionary and may not be warranted where the issues are "within the conventional expertise of judges." *Broadvox-CLEC, LLC v. AT&T Corp.*, 98 F.Supp.3d 839, 843 (D.Md. 2015). Referral to the FCC is not appropriate at this time as the matters here, although technical, are within the conventional expertise of judges.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendants PL Phase One Operations, L.P., The Cordish Companies,

Inc., Entertainment Consulting International, LLC, and PL Phase One Operations, G.P., Inc. will be denied in part and granted in part.  A separate order will follow.

                                                       /s/
                                               DEBORAH K. CHASANOW
                                               United States District Judge